UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIVIAN BEALE,

                                    Plaintiff,

        -v-

MOUNT VERNON POLICE DEPARTMENT,

                                    Defendants.

Case No. 07-CV-7520 (KMK)

<u>OPINION AND ORDER</u>

Appearances:

Sanford A. Kutner, Esq.
Metairie, Louisiana
*Counsel for Plaintiff*

Jessica C. Satriano, Esq.
Howard M. Miller, Esq.
Bond, Schoeneck & King, PLLC
Garden City, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Vivian Beale ("Plaintiff) brings this action against the Mount Vernon Police Department

alleging sexual harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1983.[1]  In addition, Plaintiff brings a state law claim for

a hostile work environment under New York Executive Law § 296.  Defendant moves for

---

[1]  The Court notes that the Mount Vernon Police Department, as an agency of a municipality, is not an entity capable of being sued.  *See Allen v. Norman*, No. 08-CV-6041, 2012 WL 3525584, at *9 (S.D.N.Y. July 23, 2012) (noting that "the claims against the Mount Vernon Police Department should be dismissed"), *adopted in its entirety by* 2012 WL 3526521 (S.D.N.Y. Aug. 15, 2012).  Instead, the real party in interest in this action is the City of Mount Vernon.  *See In re Dayton*, 786 F. Supp. 2d 809, 819 (S.D.N.Y. 2011) ("Courts also have substituted the municipality where only the department had originally been named.").

summary judgment, seeking to dismiss the complaint in its entirety. For the reasons stated herein, Defendant's motion is granted.

## I. Background

### A. Facts

The following facts are drawn from the Parties' Local Rule 56.1 statements, the depositions of Plaintiff and Police Officer Kenneth Rella, and exhibits and declarations submitted by the Parties. Plaintiff is a former Police Officer, who served for 38 years with the Mount Vernon Police Department ("Department"). (Pl.'s Mem. of Law in Opp. to Mot. for S.J. ("Pl.'s Mem.") 3; Def.'s Statement of Material Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1") ¶ 1.)

In June 2002, Plaintiff took a leave of absence from the Department, while undergoing treatment for breast cancer. (Deposition of Vivian Joan Beale ("Beale Dep.") 27:8-20.) Plaintiff understandably describes dealing with this "significant event" as a "stressful" period of her life. (*Id*. 27:20-21, 24.) In May 2003, Plaintiff returned to full-time work in the support services division. (*Id*. 33:14-19.) Plaintiff was assigned to a "light-duty" role, that was "not out on the street[, or] working the street." (*Id*. 35:11-12.) After working in the support services division for nearly two years, Plaintiff was transferred out to the patrol division in March 2005. (*Id*. 41:21-23.) On April 5, 2006, Plaintiff submitted written notice of her intent to retire to the Department, with her last day at the office being July 4, 2006, extended to September 30, 2006 through accrued leave time. (Pl.'s Mem. 3; Def.'s 56.1 ¶¶ 2-4.)

The operative facts of the instant litigation occurred while Plaintiff was a member of the patrol division, during the last sixteen months of her career with the Department. Upon joining the patrol division, Plaintiff was given a special schedule which allowed her to avoid the

midnight shift, while dealing with the effects of the medication that she was then taking. (Beale Dep. 85:19-20, 86:22-25, 87:2-4.) Plaintiff also was assigned to the same squad as, and was placed under the intermittent supervision of, Sergeant William Podszus ("Podszus"). (*Id*. 84:20-23, 95:8-9, 97:2-3.) Plaintiff "never had a working relationship with" Podszus prior to this transfer. (*Id*. 95:6-7.) Plaintiff also worked for the first time with Officer Kenneth Rella ("Rella") during this period. (*Id*. 101:8-102:5.)

During the relevant sixteen-month period, Plaintiff claims that she experienced multiple instances of harassment involving Rella and/or Podszus. "[A]round March 2005," the first day she came into the new squad, Podszus asked Plaintiff: "What do I have to do to get hours like you?" (*Id*. 87:15-16, 90:20-21.) Plaintiff took this comment to be of "a sexual nature," implying that she "did a favor for someone . . . so [she] didn't have to work the midnight shift[.]" (*Id*. 88:3-7.) Plaintiff was "stunned," and "didn't even answer him," whereupon Podszus remarked "[o]h, I forgot." (*Id.* 89:17-90:4.)

At some point within the first four months of joining the patrol division, while Plaintiff was working phones in the squad, Podszus allegedly commented that "[w]omen are useless." (*Id.* 130:6.) Plaintiff recalls that there "was no conversation . . . he just said that comment." (*Id.* 131:21-23.) Upon hearing the comment, Plaintiff asked Podszus not to make those kind of comments in front of her, to which he replied "or else?," a remark that Plaintiff perceived as intimidating. (*Id.* 132:22-133:7.)

In May 2006, while Plaintiff was either answering the phone or attending to a civilian at a service window, Rella crumpled up a piece of paper and placed it under the shoulder epaulet on Plaintiff's uniform. (*Id.* 180:8-11, 181:8-9.) Rella did not touch Plaintiff anywhere aside from

her shoulder.  (*Id.* 180:22-25.)  Plaintiff responded by telling Rella to "go in the street and do your fucking job," and "get your fucking hands off me."  (*Id.* 178:13-14, 184:6-10.)  The incident apparently ended at this point, with no further reaction from Rella or Podszus, the latter of whom was a few feet away, although a civilian said "[o]h, nice language" to Plaintiff.  (*Id.* 184:9-24.)[2]

In July 2006, Podszus also asked Plaintiff to "do some light housekeeping," (*Id.* 137:23-24, 139:12-14) and clean up the roll call room.  Plaintiff felt that Podszus "made the statement because she is a female and he was trying to humiliate her."  (Affidavit of Barbara Duncan ("Duncan Aff.") Ex. E, at 7 ¶ 9.)  On July 7, 2006, or the week before, while Plaintiff was retrieving a prisoner's property out of Podszus's drawer, Podszus asked her "[d]o I ask to go into your drawers?" stating afterwards, "[l]et me rephrase that."  (Beale Dep. 125:9-10, 24, 129:9-13.)  Plaintiff proffers that she "kn[e]w what the rules and regulations are" regarding the retrieval of prisoner property and that Podszus was attempting to "institute a rule" that he made "all of a sudden."  (*Id.* 127:12-20, 128:4-5.)

Plaintiff also alleges a number of incidents, the chronology of which she does not specify.  For instance, Plaintiff recalls taking a personal call at work, concerning her son, during which Podszus "started yelling and screaming and carrying on" (*id.* 96:18-19), eventually telling her "[d]on't ever pick up your phone again in front of me . . . I'm the commander," (*id.* 97:8-10).

---

[2]  In her Third Amended Complaint, Plaintiff describes the incident as "public humiliation by the [sic] invoking [sic] Plaintiff's breast cancer."  (Third Amended Complaint ("Am. Compl.") ¶ 27.)  In her deposition and motion papers, however, Plaintiff does not advance this characterization.  Nor has this allegation been substantiated in any other way.  For instance, Plaintiff's original written complaint about the event does not reference breast cancer.  (Affidavit of Jessica Satriano, Ex. E at Ex. 1, at 285.)  Indeed, Plaintiff does not rely on this incident in responding to the instant motion.

Plaintiff says that another female officer, Kathleen Mitchell ("Mitchell"), told her that sometime around 2005 or 2006, Podszus asked if Mitchell was a "fucking bobblehead," after she had nodded in response to a comment. (*Id*. 114:22-24, 115:8-116:2.) Plaintiff also states that Podszus has remarked that "[w]omen should not be on this job," in the past. (Duncan Aff., Ex. E, at 7 ¶ 11.) Plaintiff, at some point, also overheard Podszus refer to a female attorney as a "bitch." (Third Amended Complaint ("Am. Compl.") ¶ 24(a).)

During her time in the squad, Plaintiff thought Podszus harassed both male and female employees. (Beale Dep. 202:21-23.) On one occasion, Plaintiff heard Podszus yelling at three male dispatchers. (*Id*. 108:13-15.) On other occasions, Plaintiff also saw Podszus tell other male employees that he was "the commander," (*id*. 100:5-8), and "screamed" or "yell[ed]" at three male officers, (*id*. 110:18-20, 111:20-23, 112:12-16 (describing three different incidents between Podszus and Officers Robert Delitta, Clifford Morrison, and Phillip Kratzer)). Generally, Plaintiff believed that both male and female members within the Department had lodged numerous complaints against Podszus. (*Id*. 194:4-14.)

In early July 2006, Plaintiff went to one of Podszus's superior officers, Lieutenant Manzione ("Manzione"), about "basically all" of her complaints against him, including the comments on hours, light housekeeping, and women being useless, as well as being yelled at by Podszus for leaving her desk for a few minutes to sanitize her hands after handling prisoner property that had been urinated upon. (Beale Dep. 139:1-3, 143:1-25.) Plaintiff was "sure" that Manzione thereafter spoke with Podszus "several times." (*Id*. 140:2-8.)

On July 3, 2006, "a couple of days before [Plaintiff] left" her job, Officer Rella asked her "[w]hat are you going to do when you retire? Go work on First Street?" (*Id*. 155:25-156:2.)

According to Plaintiff, it was "common knowledge throughout the police department" that the First Street corridor was an area "where they arrest prostitutes" and is frequented by "men [] soliciting prostitutes." (*Id.* 154:9-16.) Plaintiff, taking the comment to imply that she would "work on the street as a prostitute" replied "I [don't] think that my boyfriend would like that." (*Id*. 154:5-6, 156:5-6.)[3] Rella then retorted "[y]ou can give your boyfriend half the money you make," and told Podszus, in the same conversation, "[w]ho are we going to pick on when she leaves?" (*Id.* 160:9-10, 22-23.)[4] Podszus "just sat there" and "didn't say anything." (*Id.* 160:24-25.)

The next day, on July 4, 2006, Sergeant Marren asked Beale which "spare vehicles were good," and Podszus said "[w]hy are you asking her[,] she hasn't worked the street in ten years." (Duncan Aff. Ex. E, at 7 ¶ 8.) That same day, at roll call, Rella "said something" to Plaintiff which prompted her to respond "fuck you." (Beale Dep. 169:7-9.) After Rella then said "I have 15 witnesses," Plaintiff "told him to go fuck himself again." (*Id.* 170:14, 20-21.) At that point, after roll call, Plaintiff complained to Lieutenant Manzione for a second time. (*Id.* 168:11-12, 21-22.) Plaintiff also made a verbal complaint of harassment to Captain Barbara Duncan

---

[3] Plaintiff's account of the conversation as presented here is taken from her deposition testimony. In an earlier written complaint, she had written that "Officer Rella said he did not think your boyfriend would like that[.]" (Beale Dep. 159:12-16.) In her deposition, however, she clarified that remark. (*Id.*)

[4] In his deposition, Rella states that "there is [sic] a few things on First Street that I could have been referring to," and that he was just alluding to a "mix" of a drug dealing, prostitution, and other criminality. (Examination before trial of Def., Mount Vernon Police Dep't, by Police Officer Kenneth Rella ("Rella Dep.") 33:15-16, 34:2-8.) Rella also offers a starkly different substantive account of the conversation, saying that after he asked Plaintiff whether she would work on First Street, "she kind of pushed her seat out and made a gesture . . . in her private area, and said 'I will make a lot of money with this[.]'" (*Id.* 33:3-6.) Rella then said "[y]ou wouldn't make a dollar," to which Plaintiff replied "Fuck you, Rella," and Rella laughed. (*Id.* 33:7-9.)

("Duncan") on the same day.  (Def.'s 56.1 ¶ 10; Duncan Aff. ¶ 3; Pl.'s Mem. 4.)  On July 7, 2006, Beale submitted a written "MV-5" report outlining her allegations of harassment against both Podszus and Rella, and supplemented it later that month.  (Duncan Aff. ¶ 4, Ex. B, C, D.)

The Department commenced an investigation into Beale's allegations, conducted by Duncan and Lieutenant Dante Barrera ("Barrera"), obtaining written information from twelve members of the department, and interviewing Beale, Rella, and Podszdus.  (*Id.*, ¶¶ 7-9, Ex. E.) Plaintiff also was asked if she would be willing to wear a wire as part of this investigation, to record harassing statements, which Plaintiff declined to do.  (Duncan Aff. ¶ 8; Beale Dep. 192:8-13.)

The internal affairs investigation concluded that Rella had violated the Department's policy on civility and that Podszus had violated his duties as a superior officer.  (Duncan Aff., Ex. E, at 3.)  The investigation did not find charges of violating the Department's sexual harassment policy to be substantiated with respect to either Rella and Podszus.  (*Id.*, Ex. E, at 3.) Rella accepted command discipline for making an inappropriate comment, and formal disciplinary hearings were instituted against Podszus for his failure to take action against Rella for the inappropriate comment.  (Duncan Aff. ¶ 10.)  Following Plaintiff's complaint there were no other harassing incidents between her, Podszus, and/or Rella.  (Beale Dep. 208:13-20.)

B. Procedural History

Plaintiff filed her original complaint on August 27, 2007.  (Dkt. No. 1.)  Plaintiff first amended her complaint on April 10, 2008 (Dkt. No. 6), again on November 24, 2008 (Dkt. No. 14), and for a third time on December 24, 2008, (Dkt. No. 19).  Defendant served its motion for summary judgment and accompanying papers upon Plaintiff on November 1, 2010.  (Dkt. Nos.

46, 48.)  The Court thereafter granted three separate requests by Plaintiff for extensions of time to prepare her opposition papers.  (Dkt. Nos. 50-52.)  Plaintiff served her opposition brief on February 21, 2011.  (Dkt. No. 52.)  On March 15, 2011, Defendant filed its reply brief and supporting documents, and the motion for summary judgment was fully submitted.  (Dkt. Nos. 53-63.)  The Court held oral argument on the motion on September 12, 2012.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote

omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  "A fact is

'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun*

*& Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At

summary judgment, a court is not charged with weighing the evidence and determining its truth,

but with determining whether there is a genuine issue for trial.  *See Westinghouse Electric Corp.*

*v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be "to

isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323-24.

 "A trial court must be cautious about granting summary judgment to an employer when,

as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219,

1224 (2d Cir. 1994).  Indeed, "[b]ecause writings directly supporting a claim of intentional

discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and

depositions must be carefully scrutinized for circumstantial proof which, if believed, would

show discrimination." *Id*.  Still, it is "beyond cavil that summary judgment may be appropriate

even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines,*

*Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  In fact, "'the salutary purposes of summary judgment–

avoiding protracted, expensive and harassing trials–apply no less to discrimination cases.'"

*Blessing v. J.P. Morgan Chase & Co.*, 394 F. Supp. 2d 569, 575 (S.D.N.Y. 2005) (quoting *Meiri*

*v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  Thus, the Supreme Court has "reiterated that trial

courts should not treat discrimination differently from other ultimate questions of fact." *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (internal quotation marks omitted).

B. Analysis

1. Discovery

In her memorandum in opposition to summary judgment, Plaintiff states that she "has been hampered regarding the timely receipt of critical discovery." (Pl.'s Mem. 1, 14.) Specifically, Plaintiff claims that 1,300 pages of supplemental discovery were withheld until December 4, 2010, "34 days after the defendant filed its motion for summary judgment." (*Id.* 1.) Plaintiff also claims that she did not receive requested discovery of the Department's internal investigation, including interviews of Podszus and Rella, until February 24, 2010, "a few days before scheduled depositions [on] March 3, 2010." (*Id.* 2.) Thus, Plaintiff concludes that she "cannot determine the significance of the Department [sic] comprehensive investigation . . . [because] the names of [the] witnesses were never revealed in [Defendant's] motion nor was the information or report that was acquired [sic] included in [Defendant's] motion." (*Id.* 5.)

Defendant disputes the dates on which it provided both the supplemental discovery and documents for the internal investigation. Regarding the supplemental discovery, Defendant states that it provided the requested information to Plaintiff on December 4, 2009 and has provided supporting documentation to this end. (Reply Affidavit of Jessica C. Satriano ("Satriano Reply Aff.") ¶ 2, Ex. A.) With respect to the internal investigation, Defendant has provided documentation that it was turned over in discovery in November and December, 2009. (Satriano Reply Aff. ¶ 5, Ex. C, D.) In addition, the results of the internal investigation were attached in a supporting affidavit to Defendant's motion for summary judgment on November 1, 2010. (Duncan Aff., Ex. E.)

Plaintiff has not substantiated her claims of delayed discovery with documentation. Even assuming, in the face of Defendant's submissions to the contrary, that Defendant did not provide the requested discovery to Plaintiff until, at latest, December 2010, Plaintiff has still had a year and a half to request any necessary extensions based upon information provided in those materials. Indeed, the Court granted Plaintiff three extensions to submit her opposition papers for reasons unrelated to discovery. Moreover, at oral argument before the Court, on September 12, 2012, Plaintiff did not argue that the supposed delay in discovery disclosures had materially affected Defendant's motion for summary judgment. Accordingly, the Court finds any delay in discovery disclosures to be immaterial for purposes of resolving Defendant's motion.

### 2. Sexual Harassment

Plaintiff asserts a claim of sexual harassment under two different theories: 1) "quid pro quo," and 2) hostile work environment. (Pl.'s Mem. 13 ("No matter which criteria are used in the instant case, [Plaintiff] has met the elements necessary for sexual harassment.").) "Although the terms 'quid pro quo' and 'hostile work environment' do not appear in the text of Title VII, they are useful to distinguish between 'cases involving a threat which is carried out and offensive conduct in general.'" *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998)); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (noting that "[t]he terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility" (quoting *Ellerth*, 524 U.S. at 751)).

A quid pro quo claim lies, "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, [since] he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Ellerth*, 524 U.S. at 753-54; *see also Schiano*, 445 F.3d at 603 (same). "Here, [Plaintiff] has not asserted a quid pro quo claim, for [she] has not alleged that [she] was subjected to any threats, nor has [she] claimed that [she] was subjected to [an] adverse employment action *because of* [her] refusal to submit to sexual advances." *Lewis v. N. Gen. Hosp.*, 502 F. Supp. 2d 390, 402 (S.D.N.Y. 2007) (emphasis added). The Court, therefore, finds a quid pro quo theory inappropriate and analyzes Plaintiff's sexual harassment claim under the rubric of a hostile work environment theory.

A plaintiff claiming that her employer created or tolerated a hostile work environment based on sex must "show not only that she subjectively perceived the environment to be abusive," but also "that [the] environment was objectively hostile and abusive" and "the extent to which the conduct occurred because of the plaintiff's sex." *Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010); *see also Andersen v. Rochester City Sch. Dist.*, No. 11-CV-1955, 2012 WL 1632581, at *1 (2d Cir. May 10, 2012) (summary order) ("A plaintiff claiming that her employer created or tolerated a hostile work environment based on sex must demonstrate that (1) she subjectively perceived her work environment as hostile or abusive, (2) a reasonable person would find the work environment objectively hostile or abusive, and (3) the hostility or abuse was based on sex." (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993))).[5] To satisfy this standard, under either Title VII or an Equal Protection Clause claim, a

---

[5] Defendant does not address, or otherwise contest, the subjective component of the analysis – implicitly conceding that Plaintiff was upset by the statements of Podszus and Rella.

plaintiff must produce enough evidence to show that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gorzynski*, 596 F.3d at 102 (internal quotation marks omitted); *see also Harris*, 510 U.S. at 21 (noting that a hostile work environment exists under Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal quotation marks and citations omitted)); *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (same); *Hayut v. State Univ. of New York*, 352 F.3d 733, 744-745 (2d Cir. 2003) (noting that "traditional Title VII hostile environment jurisprudence" governs Section 1983 claims of Equal Protection Clause violations (internal quotation marks omitted)); *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 392 (S.D.N.Y. 2011) ("Thus, where a plaintiff's equal protection claim parallels his or her § 1983 claim, the 'elements of one are generally the same as the elements of the other and the two must stand or fall together.'" (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004))).

Courts must "look[] at all the circumstances," surrounding such conduct, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd*, 678 F.3d at 175 (emphasis omitted) (quoting *Harris*, 510 U.S. at 23); *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("To decide whether

---

(Def.'s Mem. 4-15 (contesting other elements of Plaintiff's hostile work environment claim); Duncan Aff., Ex. E at 12 (noting that Plaintiff viewed the commentary and behavior of Podszus and Rella as "caustic and demeaning . . . [and] degrading").)

the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."). "[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original). Thus, "[Plaintiff] must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [Plaintiff's] working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted); *see also Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F. 3d 976, 978 (7th Cir. 2000) ("Title VIII does not forbid sexual harassment as such. The harassment must be sufficiently severe that a rational trier of fact could find that it had actually changed the conditions of the plaintiff's workplace . . . ." (citations omitted)). However, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Schiano*, 445 F.3d at 606 (internal quotation marks omitted); *see also id.*, at 608 (noting that there are "of course, cases in which it is clear . . . [that] the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim"); *Terry*, 336 F.3d at 148 (noting that a workplace need not be "unendurable" or "intolerable" to be actionable under Title VII). Ultimately, "[s]ummary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001) (alterations and internal quotation marks omitted).

In applying this standard, courts must be mindful that Title VII is not a "'general civility code,'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)), and is inapplicable to "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also Vito v. Bausch & Lomb Inc.*, 403 Fed App'x 593, 596 (2d Cir. 2010) (following *Faragher*). "The kinds of workplace conduct that may be actionable under Title VII include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Redd*, 678 F.3d at 175 (alterations and internal quotation marks omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). And, such "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is [simply] beyond Title VII's purview." *Harris*, 510 U.S. at 21; *see also Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 ("The standard for a hostile work environment claim is a demanding one.").

As noted, the Court "must also consider the extent to which the conduct occurred because of the plaintiff's sex." *Gorzysnki*, 596 F.3d at 102. Indeed, "it is 'axiomatic' that in order to establish a sex-based hostile work environment [claim], a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 223-24 (2d Cir.

2004) (reversing grant of summary judgment and remanding the case to the district court where a reasonable jury could have concluded that plaintiff's work environment was hostile and pervasive enough to support a claim of discrimination based on sex). "Incidents, however abusive, that are not gender-related are not relevant to establish a claim against [Defendant] that can survive its motion for summary judgment." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09-CV-2583, 2012 WL 1079943, at *7 (S.D.N.Y. Mar. 30, 2012); *see also Norris v. N.Y.C. Hous. Auth.*, No. 02-CV-6933, 2004 WL 1087600, at *12 (S.D.N.Y. May 14, 2004) ("[R]udeness without any evidence of discriminatory intent does not constitute discrimination . . . .").[6]

Looking that the record as a whole, it is beyond dispute that some of the incidents which Plaintiff cites, while rude and/or inappropriate, are unrelated to her sex, including: (i) Podszus "yelling and screaming" at Plaintiff for taking a personal call at work, (ii) Podszus yelling at Plaintiff for leaving her desk to sanitize her hands after handling unclean property, and (iii) Rella

---

[6] The Court recognizes that "[f]acially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim." *Alfano*, 294 F.3d at 378. "But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Id.* "Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that 'the same individual' engaged in 'multiple acts of harassment, some overtly sexual and some not.'" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547-48 (2d Cir. 2010) (quoting *Alfano*, 294 F.3d at 375); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 361, 364 (2d Cir. 2001) (holding that hostile work environment claim could be supported by evidence that supervisor heaped abuse on plaintiff because she rejected his sexual advances). Here, however, Plaintiff offers no evidence of a pattern of sexual advances or other gender-based hostility (e.g., unfavorable hours or responsibilities) supporting an inference that the gender-neutral comments of Podszus and/or Rella were part of a pattern of discrimination. *See Hamilton v. Bally of Switz.*, No. 03-CV-5685, 2005 WL 1162450, at *9 (S.D.N.Y. May 17, 2005) (noting that "a series of ambiguous incidents, the vast majority of which plaintiff herself did not regard as offensive at the time, cannot be magically transformed into a pattern of abusive behavior, simply by viewing them in the aggregate").

placing a crumpled piece of paper in Plaintiff's shoulder epaulet. In fact, Plaintiff stipulates that when Podszus yelled at her for taking a personal phone call and for leaving her post it was "not sexist." (Pl.'s Mem. 16.)[7] Likewise, there is no hint of sex-based animus motivating the yelling incident after Plaintiff left her post to sanitize her hands. (Beale Dep. 146:14-148:7.) Indeed, as Plaintiff acknowledges, Podszus often would yell at male subordinates in similar circumstances, thereby undermining any claim that these comments are actionable under Title VII. *See O'Neal v. State Univ. of N.Y.*, No. 01-CV-7802, 2006 WL 3246935, at *7 (E.D.N.Y. Nov. 8, 2006) (holding that several instances of rude, but gender-neutral behavior by supervisor were insufficient to establish a hostile work environment); *Lucenti v. Potter*, 432 F. Supp. 2d 347, 362 (S.D.N.Y. 2006) ("Allegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim."); *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000) (noting that Title VII "does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors . . . ."). Finally, Plaintiff does not allege that Rella's action of stuffing a crumpled piece of piece under her shoulder epaulet was sexual. *See, e.g.*, *Roundtree v. Securitas Sec. Servs., Inc.*, No. 10-CV-778, 2012 WL 631848, at *7 (D. Conn. Feb. 27, 2012) (noting that "the physical acts [plaintiff] describes – touching his shoulders, laying a head on his shoulder – are not overtly sexual"); *cf. Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 521 (S.D.N.Y. 2000) (finding an atmosphere of sexual hostility where physical contact "was neither harmless nor accidental").

---

[7] Plaintiff "stipulate[s] that all comments coming from Sgt. Podszus are not sexist." (Pl.'s Mem. 16.)

On the other hand, a number of other incidents that Plaintiff alleges could plausibly give rise to an inference of sex-based harassment. These allegations include: (i) Podszus's question of "how do I get hours like yours," if implying that Plaintiff "did a [sexual] favor for someone," to get such favorable hours; (ii) Podszus's remark that Plaintiff do some "light housekeeping," if he made the statement as a way of humiliating her as a woman; (iii) Podszus's single remark that "[w]omen are useless"; (iv) Podszus's comments that Mitchell, a female officer, was a "fucking bobblehead," and that a female attorney was a "bitch"; (v) Podszus's remark that "[w]omen should not be on this job"; vi) Rella's comment that Plaintiff ought to "work on First Street," an apparent reference to prostitution, after she retired; and vii) Podszus's comment that he doesn't go into Plaintiff's desk drawers without her permission.[8]

Taking into consideration the totality of the circumstances, the Court finds that the conduct at issue was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. None of the conduct at issue involved physical harassment, and while the handful of statements by Podszus and Rella at issue were sophomoric and boorish, they were not actionable under Title VII. For example, Plaintiff cites Podszus's March 2005 comment about what he would have to do to get work hours such as Plaintiff (who had been allowed to skip

---

[8] Defendant argues that Podszus and Rella "did not discern between men and women in treating people the way [they] did or making comments such as those allegedly directed towards Plaintiff." (Def.'s Mem. 12.) The motivation and discriminatory import of many of the incidents at issue, however, are fact disputes not properly resolved through summary judgment. *See Holtz*, 258 F.3d at 75 ("An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts . . . presents an issue for the jury." (internal quotation marks omitted)). Moreover, the Second Circuit has held that sexual ridicule of both men and women may still be actionable as a hostile work environment for female employees. *See Petrosino*, 385 F.3d at 222-23. As such, Defendant's citation to the "Vince Lombardi rule," that "someone who treats everyone badly is not guilty of discriminating against anyone," is colorful, but misplaced (not to mention unfair to Coach Lombardi). (Def.'s Mem. at 13 (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010).)

overnight shifts because of her medical issues). (Third Am. Compl. ¶ 22; Beale Dep. 87-90.) Plaintiff admits that Podszus made no explicit reference to sex in this comment, and that her view that this comment violates Title VII comes from her belief that Podszus was implying that Plaintiff "did a favor for someone" to get those hours. (Beale Dep. 87:21-89:10.) Apparently, implicit in this interpretation is that Podszus was suggesting that Plaintiff did a sexual favor for somebody. Yet, such an inference built upon a belief seems far removed from the type of statement found to be actionable under Title VII. *See Alfano*, 294 F.3d at 380 (affirming summary judgment for defendant, in part, on conclusion that several statements lacked "any sexual overtone").[9]

The same conclusion applies to Plaintiff's assertions about Podszus calling another female employee a "fucking bobblehead," and a female attorney a "bitch." Neither comment was made to or about Plaintiff. In fact, the bobblehead remark was made after the other employee was nodding affirmatively in response to a comment by Podszus. Plaintiff has not offered any authority, and the Court is aware of none, suggesting that the use of "bobblehead" in such a context is at all unlawful under Title VII. And, while Podszus (and others) should learn to avoid calling somebody a "bitch," courts have regularly concluded that the occasional use of that term is not severe enough to create a hostile work environment. *See, e.g., Garone v. United*

---

[9] The same can be said for Podszus's comment that he did not "ask to go into [Plaintiff's] drawers." Podszus made this statement when he observed Plaintiff in fact going into his desk drawer (apparently without his permission). (Beale Dep. 122:10-12, 125:9-10.) Moreover, Plaintiff admits that after Podzus made this comment, he followed up by saying, "let me rephrase that." (*Id.* 125:24.) The Court understands the innuendo that could be inferred from the use of "drawers," but the undisputed evidence about the context in which Podszus made the comment, and the fact that he followed up by offering to rephrase the spontaneous statement, tips the scales against Plaintiff.

*Parcel Serv., Inc.*, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006), *aff'd by*, 254 Fed. App'x at 108 (2d Cir. 2007) (holding that "a few off-color comments" including the terms "office bitches," did not rise to the level of an objectively hostile work environment); *Augustin v. Yale Club of N.Y.C.*, No. 03-CV-1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (noting that calling a person "black bitch" is deplorable, but when done only four or five times over a five-year period does not create a hostile work environment); *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of supervisors calling plaintiff a "bitch" and making sexual remarks over five years of employment insufficient to support a claim of discriminatory harassment).

The remaining few statements, while ranging from foolish to deeply insensitive, also do not rise the level of being severe or pervasive enough to create a hostile work environment. The comments from Podszus include his one-time question to Plaintiff about her doing housekeeping during roll call, and his (at most) two comments about women being useless and not belonging on the job, while the sole comment from Rella (made in the presence of Podszus) involved his suggestion (in a question just before Plaintiff's self-imposed retirement date) that Plaintiff would work on First Street after her retirement, a reference to a part of town frequented by prostitutes. These few comments certainly could be viewed as promoting a 17th century view of women, but they do not rise to the level of altering Plaintiff's working conditions.[10]

---

[10] The Court notes also that while an "extraordinarily severe" single incident could create a hostile work environment, *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008), no such incident is alleged to have occurred in the instant case. *See, e.g.*, *Scott v. City of N.Y. Dep't of Corrs.*, 641 F. Supp. 2d 211, 226 (S.D.N.Y. 2009) (collecting cases where a single incidence of physical contact in the employment context supported a viable hostile environment claim).

The Court recognizes that "determinations [regarding a hostile work environment] are to be made on a case by case basis considering all the individual facts at hand." *Roundtree*, 2012 WL 631848, at *8 (quoting *Schiano*, 445 F. 3d at 607). Moreover, while isolated incidents, such as those in this case, generally are insufficient to establish that the harassment was pervasive enough to alter the conditions of employment, the law does not establish a "magic number of incidents above which harassment is actionable." *Hamilton*, 2005 WL 1162450, at *8. And, finally, courts recognize that egregious conduct in other cases does not "mark the boundary of what is actionable." *Harris*, 510 U.S. at 22. Nonetheless, the Court notes that the half-dozen comments at issue in this case over a sixteen-month time period (even including those the Court has found did not have any sexual overtones in them) are less severe and no more pervasive than those found by other courts within the Second Circuit, and by the Second Circuit, not to be sufficient to create a hostile work environment. *See, e.g.*, *Mormol*, 364 F.3d at 58-59 (affirming summary judgment where supervisor, within a one-month period, told plaintiff he would not approve her vacation request unless she slept with him, offered various job benefits if she slept with him, and threatened to reassign her when she rejected his offer); *Alfano*, 294 F.3d at 370, 378-81 (reversing jury verdict for plaintiff based on a handful of comments/pranks involving carrots, and discussing plaintiff's sexual practices and displaying a vulgar cartoon depicting a subordinate with whom plaintiff allegedly had improper physical contact); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." (internal quotation marks omitted)); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (affirming summary judgment where supervisor told plaintiff she had been voted the "sleekest

ass" in the office and supervisor "deliberately touched [plaintiff's] breasts with some papers he was holding in his hand" (internal quotation marks omitted)); *St. Louis v. N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 233-34 (E.D.N.Y. 2010) (holding that a few remarks that the supervisor did not like working with a woman did not constitute a hostile working environment); *Garone*, 436 F. Supp. 2d at 469 (holding "the occasional off-color remark" including the terms "office bitch," and "brooklyn bimbettes," and sexually suggestive comments by coworkers did not rise to the level of an objectively hostile work environment), *aff'd*, 254 Fed. App'x at 110; *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (finding no hostile work environment where fellow store manager made comments about plaintiff's appearance, repeatedly asked her out on a date, sent her numerous emails professing his love for her, called her at home, and gave her gifts); *see also Hamilton*, 2005 WL 1162450, at *9 (comparing conduct in that case with others where summary judgment was granted or affirmed to conclude that plaintiff had not established a hostile work environment). Therefore, taking all the facts in Plaintiff's favor, the Court concludes that Plaintiff has not demonstrated that Defendant's conduct was severe and/or pervasive enough to alter the conditions of her employment.[11]

---

[11] It also bears noting that while Plaintiff claims that she would have delayed her retirement but for the conduct of Rella and Podszus, there is no supporting evidence in the record that she took steps to this end. In fact, the evidence establishes that it was Plaintiff who chose July 6 as her retirement date, and that she did so on April 5, 2006, well before most of the comments at issue in this case. Also, Plaintiff, who had spent thirty-eight years as an employee in the Department and had already had submitted her resignation letter, did not complain to a superior officer about the conduct of Podszus and Rella until "early July," within days of her slated last day in the office. (Beale Dep. 139:1-3, 143:1-25.) Thus, Plaintiff's actions would indicate that for over fifteen of the sixteen months at issue, the conduct of Rella and Podszus did not merit an official complaint – even seven weeks after Plaintiff had given the Department notice of her intent to retire.

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's Title VII and Equal Protection hostile work environment claims.[12]

### 3. Title VII Retaliation Claim

Plaintiff's Third Amended Complaint states a claim for retaliation under Title VII. In her opposition papers, however, Plaintiff withdraws this claim, noting that "there was no correlation between the violation of the plaintiff's rights and any type of subsequent retaliation." (Pl.'s Mem. 18 (conceding that "[t]here are no retaliation claims pertinent or related to the Title VII allegation in the case at bar.").)[13] The Court agrees that Plaintiff has not demonstrated she engaged in any protected activity or suffered an adverse employment action. *See Milne v. Navigant Consulting*, No. 08–CV–8964, 2010 WL 4456853, at *4 (S.D.N.Y. Oct. 27, 2010) (dismissing retaliation claim where plaintiff failed to establish a casual connection between protected activity and an adverse employment action). Accordingly, the Court deems Plaintiff's Title VII retaliation claim to be withdrawn and dismisses it with prejudice.[14]

---

[12] Because the Court concludes that Plaintiff has failed to offer sufficient evidence to establish Defendant's conduct violated Title VII, it need not and does not consider Defendant's *Faragher/Ellerth* affirmative defense.

[13] Plaintiff reiterated this concession at the oral argument held before the Court on September 12, 2012.

[14] Confusingly, Plaintiff's brief states that she has made a prima facie case of retaliatory discharge, but then proceeds to a discussion of parties not involved in this litigation with respect to vicarious liability for a hostile work environment. (Pl.'s Mem. 10-11.) In the face of Plaintiff's clear statement that "[t]here are no retaliation claims pertinent or related to the Title VII allegation in the case at bar," and that "[a]ny assertions [on this point] . . . should be set aside," (Pl.'s Mem. 18) the Court ignores this otherwise inscrutable section of Plaintiff's brief.

### 4. State Discrimination Claims

Plaintiff's Third Amended Complaint brings causes of action under New York Executive

Law section 296. (Am. Compl. ¶¶ 53-54.) Defendant moves to dismiss these claims because the

"doctrine of *respondeat superior* . . . is not available in employment discrimination cases

brought under Executive Law." (Def.'s Mem. 21(emphasis in original).) Plaintiff also concedes

this issue in her opposition brief, stating that "[a]ny reference to New York Executive Law §295

(sic) should be deleted."[15] (Pl.'s Mem. 18.) Accordingly, the Court deems all of Plaintiff's state

law claims to be withdrawn and dismisses them with prejudice.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted. The

Clerk is respectfully requested to terminate the pending motion and close the case. (Dkt. No.

53.)

SO ORDERED.

DATED:     White Plains, New York
           September **28**, 2012

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[15] Plaintiff's Third Amended Complaint contains only references to section 296, with no
references to section 295. Likewise, Defendant's papers only reference section 296.
Accordingly, Plaintiff's concession of all causes of action relating to section 295 is clearly a
typographical error actually denoting section 296. Plaintiff also reiterated this concession at the
oral argument held before the Court on September 12, 2012.